from Mr. Valconia. I was waiting for counsel to leave, but that's okay. Good morning, your honors, and may it please the court, my name is Rafi Malconian, for the appellant in this matter, CAE. Your honors, this case on the merits is about the extremely sophisticated global market in the purchase and sale of semiconductor manufacturing machines. CAE, my client, is the leader in creating that market. And the reason it's the leader is that it has extremely sophisticated and granular data about each of the participants in that market. And that is what we are going to be litigating on the merits in this case in the trial court. Today the issue is the district court's denial of the preliminary injunction. A preliminary injunction designed to preserve the status quo while we're litigating the case to make the market competition fair during the time that we are opposed to each other. We have two points I want to talk about today. First is the district court's error with respect to the client list data, and second is the district court's error with respect to what we like to call the transactional data. That's the data about who bought what machine, when, and at what price. So let me start with the client data. The district court, the only basis on which the district court denied our preliminary injunction with respect to that data is that the court held that the market in which CAE participates is quote-unquote limited and bounded. I think thinking about the district court's opinion, what he was imagining was sort of the automotive industry, and that we're a company that sells tires, and of course we know that the companies we sell tires to are Ford or Toyota or Nissan or wherever else. And so when our opponent, Mr. Meissner, went from CAE to MOVE, he knew all the people that were involved in the market. And if that were the case, we would agree, Your Honors, that that is a limited and bounded market. But that is not the situation here. We are dealing with an incredibly complicated market all across the globe. In our database, and this is in the preliminary injunction hearing evidence, at the time of database. And these are not all large companies. These are companies all over the world. They have one, two, five employees. There's companies in China, in South America, in the U.S. and in Europe. So are you saying it's complicated because there's so many people involved in doing it, or is there some other reason it's complicated? Well, no, Your Honor. It's complicated because there's small companies all over the world. So this isn't a situation, like the district court seems to have believed, where there's a few large companies, and Mr. Meissner could know all the companies that are involved. And when he went to MOVE, he's just using his knowledge that he's gathered over the years. That's not what we're talking about. This is a situation where Mr. Meissner took our data, and he took it over to MOVE, and  And there's no way he could have done that just based on his memory or what he might know about the market. This is so complicated, so detailed, that there's no way you could know without— I still don't understand what the complicated part of it is. It's just a lot of people doing the same thing. It sounds like it's not that hard to do if that many people can figure out how to do it. You're telling me people all over the world are doing it all the time. Well, Your Honor, let me be clear about something. There's only a couple of companies that do the buying and—that create the market to buy and sell the semiconductor machines. That's what CAE does. That's what MOVE does, our competitor. There's tons, tens of thousands of companies that actually need semiconductor manufacturing machines, and they're the ones buying and selling.  Mr. Judge, let me ask you a question. CAE knows who needs a machine, what price they might want to pay, what price someone might want to buy it at, when they might need it, all those kind of data, and that's the kind of data that Mr. Meissner took. That's more the transactional data that I'm going to talk about in a second, but he also took the client data, just the names, the email addresses, the cell phone numbers, all these people all over the world. Obviously, that's not a finite number of people, because you're telling me people are popping up all the time, brand-new people are getting involved. So how is it that CAE has some master list that nobody else has access to, other than somehow acquiring it from CAE? Well, Your Honor, we have been working on a list of customers, on our compilation of customers, for decades. CAE was founded in the 1980s as a catalog company, so you could get a catalog that had all these semiconductor machines in it, and we've been collecting the names of people since then. Now, the CAE is a very different company now, it's a tech company, it uses very sophisticated computers to find out who needs to buy and sell these machines, based on all the data that we have, but we have been working on this for decades, and if you look at the declaration of Mr. Gill, who's one of our high executives, and his preliminary injunction testimony, you'll see that he says, we've spent hundreds of thousands of man-hours, and millions of dollars trying to put together this list, and as I was telling you, the district court found that he failed to present evidence that a masonry group had accessed or used any information beyond the identities of the contracts, and he said that there's little direct evidence that any of the trade seekers were ever in his possession, much less that he'd used those pieces of information, now, where is the error in that? Yes, your honor, so let me just make one point clear before I directly answer your question. That relates only to the transactional data, that question. The client data, the first error that we identified, the district court's belief that the market was bounded and limited, that has nothing to do with that, and if you agree with us  in that argument, I'll stop answering my question. Yes, your honor, I'm sorry, I just wanted to make sure there were two different things. Now, as to your question, I think that the district court made a legal error when he was analyzing the use. What the district court says is that there is no direct evidence of use of the trade secrets, and again, we're talking about the transactional data trade secrets. That is not the legal test under Texas law. He said he failed to present evidence, he failed to present evidence that he had accessed or used information beyond the identities of the CAE contract, and then he says there's little direct evidence that the trade secrets were ever in his possession, much less that he used or threatened the information. Yes, your honor, and I think what the error there is, is the concentration on the word direct. You do not need direct evidence of use in order to get a preliminary injunction under these kind of cases. You need circumstantial evidence, first of all. That is enough to even win on the merits, much less at a preliminary injunction stage. But also, you can simply show that they are in a position to use the evidence, excuse me, the secret information. Larry, the district court's order, he's not pointing it out for like a decade, but he says there's little direct evidence of it, and implicit in his order is you didn't prove it. Obviously, the circumstantial evidence is out there, the facts that otherwise are out there, but you're hurdled to clear here on the dial of a preliminary injunction to say more where that's erroneous in some fundamental way, but I'm not hearing that. Well, your honor, I have to respectfully disagree with you on the reading of the district court 's opinion. I think the basis of the district court's opinion with respect to the transactional data is the holding that there's no direct evidence of use. He does say certain other things about what Mr. Meissner testified to, but I don't read those as fact holdings. I think that those are comments he's making as he's going through the opinion, but if you look at the actual operative language of the opinion, I think it all hinges on this direct evidence of use finding, and in our view, that was error, both legal and factual error, and it's legal error because, again, as I've already said, we don't need direct evidence at all. You can have circumstantial evidence, and you don't need evidence of use. You just need evidence that they're in a position to use. I'm sorry, your honor. Did you argue to him about if you would direct at this point to him? Yes, your honor. Those are the, you know, I can't cite it right this second exactly where it is in the record, but I think in our briefing and in the preliminary injunction hearing, we made clear to him that there were other paths to winning rather than showing actual use right at the time of the preliminary injunction. Judge Graves, did you have a question? No. Go ahead. Let me just go through, and I know we're talking about the legal point, but let me talk about what I think is the evidence of being in a position to use, and it really is extraordinary to me, the amount of evidence that we have at a preliminary injunction posture for this case, and again, we're talking about the transactional data. This doesn't go to the client data, but it's an extraordinary amount of evidence. We have these, we have clear evidence that Mr. Meissner took these documents. In fact, it's undisputed that he took them. He admits he did, took them in the preliminary injunction hearing, and he admits that he was not supposed to take them. He signed a contract with us that says, I don't have any of these documents, and yet he did. Let me pick you up on this. The district court found that there was no evidence that Meissner or Moove had in fact access to use, quote, any information beyond the identities of the contact, and that neither Moore nor Meissner actually had any potential trade secrets contained in the transactional documents. Now, that doesn't sound there like he's relying on, insisting on direct evidence only. Your Honor, I— He said any. I, again, respectfully disagree with that reading. You know, you've got a problem. You said, you accent direct, and I'm looking at the thing, and he said any. I understand, Your Honor, but I— He doesn't say any direct evidence. Yeah. I disagree with how you're reading that. I'm not nitpicking you, but that's your problem, to overturn this. I understand that's my problem, and I know it's uphill on that point, but what I want to be clear is that that's not what the district court found, in my view. The district court, if it had found that, I think the opinion would have been a page long. He would have said, I've analyzed the preliminary injunction hearing. He never had these documents, as my friends on the other side say, so what's the problem? But that's not what the district court said. What's your trial date? What's the trial date, Your Honor? Right now, the trial, I think, is not—nothing's been happening while we've been up here on appeal, on the expedited appeal, but I am confident that these kind of parties that are so well-represented—and I'm not trial counsel. We'll be able to do it quickly. I'm beginning to get a sense of the burden of the preliminary injunction on appeal when they—you're—by bringing the appeal, you delay the trial, obviously.     They can't try it while you're on trial. They can't try it while you're on trial. So I assume that—let's say, that you couldn't get a—get to trial quickly on this before the district court. This is now a preliminary injunction, right? Preliminary to what? Preliminary to a trial. Yes, Your Honor. And that's why— I'm sorry. Well, what trial date would you have? Again, Your Honor, I don't know that we have a trial date right now, but I think this could be tried quite quickly if we get an ex ante injunction that just preserves the status quo. We've done a ton of discovery already, as Your Honor knows, from this extremely voluminous record. And so I don't know that there's much more discovery that would need to be done. I would have to— But, of course, I'm trying to get in my mind what the heavy burden on you in a preliminary injunction. And implicit in that is you don't have a trial. If you were scheduled for trial the following week, then obviously you wouldn't be here, I take it, right? If trial was in a week, probably not, Your Honor, because I'm not sure that the preliminary injunction would help us. The question is, how about a month? My point being that you have brought an appeal from a preliminary injunction, and you're not saying here that it's not a motion for summary judgment. You just want to stop—you want to dock it out on a preliminary injunction here to stall things, pending trial. Well, I mean, but nobody tells me when the trial's going to be. Both trial judges are—have some flexibility in things with emergency situations. They try to move as quickly as possible. On the other hand, it might be a long time, so— Well, Your Honor, I agree with that, but I think that cuts somewhat in our favor, because they have this extremely valuable information of ours. I know they're going to come here and say that they don't have it, but we disagree with that. And, you know, pending trial— No, Judge Pittman, I've been rushing it. The dock is pretty current. I'm sorry, Your Honor? I assume that this is an appeal from Judge Pittman's court, correct? This is an appeal from Judge Pittman. Yes, Your Honor. Okay. Thank you. Well, I have just about a minute left, so let me maybe talk about the evidence of the use while I have a little bit of time. So I was on the text messages that Mr. Meissner sent to move while he was negotiating his entry. Those are extraordinary bits of evidence, and the one I would point Your Honors to is the email. It's at ROA-6294. I would urge you to look at it. It's where Mr. Meissner is saying to move, I've talked to my lawyer, and he says even if you have secret information, you can use it if it's available on Google somewhere. If you can take the secret information, type it into Google, and that comes up, then you can use it. And that is a completely misunderstanding of Texas trade secret law, and it explains why Mr. Meissner thought he was able to get away with this. My time is up, Your Honor. I'll have five minutes for rebuttal. Thank you. Thank you, Scott. Thank you, Your Honors. May it please the Court. I'm Catherine Chiarello on behalf of the Appalese Move Technology Incorporated and Nicholas Meissner. CA's counsel is exactly correct that we have a dispute between us about whether Mr. Meissner and Move have any of the CAE documents from the Google Drive, but the district court made a factual finding that Mr. Meissner does not have those documents, that Move does not have those documents, and CAE has failed to carry its burden to show you how that factual finding was clearly erroneous. And in response to your question, Judge Higginbotham, about the trial date, we do not currently have one, but I'll note that CAE, as the plaintiff, has not requested a trial date, even though this injunction was granted in December, just before the end of the year. So here we are months and months later, and they have not asked the court to set this for a trial. Before I talk about how CAE has failed to carry its burden here, I just want to take a quick moment to focus on how we got here. As CAE acknowledges, we did extensive discovery, almost six months of discovery, that involved thousands of pages of documents. There were seven full-length fact witness depositions. There were four expert witness depositions, which had been preceded by expert reports. And after all of that evidence, the court held a mini-trial. We had a two-day evidentiary hearing in which the district court heard live testimony and cross-examination from most of those witnesses and was presented with hundreds of exhibits. And as the court has recognized, after all of that evidence, the district court denied CAE's preliminary injunction request based on two primary factual findings. First had to do with the Google Drive documents, which is what CAE calls the transactional documents, and the second had to do with customer identities that were in Mr. Meisner's head. Now CAE, throughout its brief and in its argument today, refers to a customer list. There is no customer list at issue in this case. Unlike many of the trade secret cases I'm sure that you have heard where a former employee emails themselves a list that includes customer names and contact information, perhaps transactional data, there is no evidence that Mr. Meisner possesses now or ever possessed a customer list. The only evidence that the district court considered was the information that Mr. Meisner retained in his head about the identity of customers. And these were identities that he remembered after he already sat out his one-year non-compete. The district court found, as a matter of fact, that CAE had not carried its burden of showing that Mr. Meisner or MOVE possessed any of the documents that were in the Google Drive when Mr. Meisner started working for MOVE. And the district court also found that CAE had not carried its burden of showing that the customer identities were a secret, meaning that they were not known or readily known to others in the industry. And as a result of those factual findings, the district court concluded that CAE had failed to carry its burden of showing a likelihood of success on the merits. CAE's burden here is to persuade you that those factual findings were clearly erroneous. As you know, that means that they were not plausible in light of the evidence of a whole. Now, this court has held several times that it would only reverse the denial of a preliminary injunction under extraordinary circumstances. And CAE falls far short of those standards. It does not point you to any evidence that the district court didn't consider or improperly excluded. Instead, what it has done in its papers, and again today, is just cherry pick certain evidence, argue its preferred interpretation of that limited evidence. But as to the rest of the evidence, which must be considered under the clear error standard, the court, CAE invites this court to ignore evidence that doesn't support its interpretation, and it invites you to reweigh the witness's credibility. But none of that establishes clear error or the extraordinary circumstances which would justify the reversal of the district court's order. With the court's indulgence, I'd like to talk about those two separate buckets of information. The first is the Google Drive, or as he calls them, the transactional documents. And the second are the customer communities in Mr. Meisner's head. As to the Google Drive, the district court made three primary factual findings. First, it found that Mr. Meisner deleted the remaining CAE documents before he started at MOVE. And that's on page 5 of the court's opinion, where it credited Mr. Meisner's testimony on that point. Second, the district court found that Meisner has no access to the Google Drive documents, and also that MOVE has no access to the Google Drive documents. And these findings were based on Mr. Meisner's testimony, which the district court expressly found to be credible, even subject to vigorous cross-examination from trial counsel down below. And Mr. Meisner's testimony was also supported by the forensic analysis that was performed by his expert. Additionally, the district court heard testimony from Mr. Young, who is a co-founder of MOVE and was MOVE's corporate representative. He testified that MOVE never received any CAE documents from Mr. Meisner. And that testimony was supported by the forensic analysis of MOVE's expert. And after hearing all of that testimony, the district court concluded that CAE had failed to carry its burden with respect to any information on the Google Drive. Now, all of CAE's focus on the documents in the Google Drive, and they talk a lot about whether that information is a secret, and how much money they spent compiling it, and whether others know the information in the documents. So that's contact information, prior trading information, prior pricing. I got the impression through the briefs that your client did enjoy a rapid expense in its business. And also, part of the explanation was profit, as I recall, had to do with your client's superior language facilities. That is, at certain markets, he spoke the language, literally, and it was a pleasure. Can you elaborate on that? Yes, Your Honor. Mr. Meisner worked at MOVE, I'm sorry, at CAE until 2018. In 2017, while Mr. Meisner is still working for CAE, two individuals started MOVE. That's Mr. Young and Mr. Zhao. And both Mr. Young and Mr. Zhao were well experienced in this semiconductor used equipment brokering industry. So they started building their business. They were going out to industry trade conferences and meeting people. They were expanding on the contacts that they already had, I believe, at the time that they started in 2017. Each of them had been in the business for approximately 10 years. And so they're building their business in 2017, in 2018, while Mr. Meisner is still at CAE, in 2019, while Mr. Meisner is sitting out his non-compete. And then they don't hire Mr. Meisner until 2019. It is correct that the record reflected that MOVE was starting to show success in 2019, but it was not instantaneous success because Mr. Meisner joined them. With all due respect to Mr. Meisner, he's a talented salesperson, but they had already been building the business for several years, such that they were obtaining funding from outside sources. And this is all in the record that was presented to the district court. As you pointed out, Judge Higginbotham, part of the reason for their success is literally that Mr. Young speaks Chinese. And the record also—he testified before the district court that he lived in China and Asia and would knock on people's doors and would go to— What does the record show about the geographical dispersion of this market? I'm sorry, Your Honor? What does the record show about the geographical dispersion of this market? Is it—are you drawing a lot more business from the Far East or domestically? The record does reflect that there is quite a bit of this market in the Far East, in Asia. The record does reflect that quite a bit of this market, the participants are in Asia and are Chinese-speaking companies. In its briefing, primarily, CAE talks a lot about what's in the Google Drive and how those documents are valuable. But with all due respect, that's really just a lot of noise, because it doesn't matter what was in the Google Drive. The district court made a factual finding that CAE had not shown that MOVE or Meisner possessed those documents by the time that he went to work for MOVE, or that he had not used or threatened to use those documents. And just as CAE failed to carry its burden before the district court, it has failed to carry its burden here to show that that factual finding was clearly erroneous. Next, I'd like to talk about the customer identities. And again, we are not talking about a list of customers that includes contact information or prior sales data. We're simply talking about the identities of people and companies that Mr. Meisner remembered after he sat out his one-year non-compete as a result of being in the business for more than 10 years. The district court made a factual finding that CAE had not met its burden to establish that those individuals were a secret. Specifically, the district court found as a matter of fact that Mr. Meisner had personal knowledge of and relationships with many industry players, that many of the customers that CAE claimed were a secret at the hearing were already in MOVE's database before Mr. Meisner joined MOVE, and that MOVE became connected with many of CAE's customers by attending industry conventions. Now, CAE argues here that that is wrong, but it doesn't point you to any evidence that would show that the district court's conclusion was clearly erroneous. In this case, and on this record, what CAE is doing is trying to weaponize trade secret law to impose anti-competitive restrictions that would clearly violate non-compete law. And non-compete, as the court is aware, has to be reasonable in time and in scope. We are four years past the period when Mr. Meisner stopped working for CAE. No non-compete would be enforceable for that period of time. But under CAE's theory, Meisner should be prohibited from competing with CAE by contacting individuals that he knows or has personal relationships with forever because they claim trade secret protection for that knowledge in his head. CAE would also bar Meisner's new employer from competing with those customers, even the ones that it knew about before they hired Mr. Meisner. Can you give me some general information about the size of this market they're competing in? One small index, what are the gross receipts of these competing companies? Your Honor, I apologize. I don't know the answer to that question. But I will tell you, and you heard CAE's lawyer talk about the 70,000 contacts that are in their database. There was evidence before the district court they've only ever done business with 7,000 of those customers. I don't believe there was any evidence about how many customers MOVE has done business with. And at the end of the day, they showed, they offered some specific lists of customers that they wanted to fight about. It was a list of 60 people, and there was testimony from MOVE that it was familiar with nearly all of those people, either because they'd already done business with them or because they'd met them at conferences or because other traders other than Mr. Meisner had added them to the database. So although there is evidence that there is the potential for large numbers in this market, when it came down to brass tacks, what CAE was talking about was about 60 main customers, and the evidence showed that they were not a secret. And CAE has not shown why that factual finding by the district court was erroneous. Now, something that they've talked about is they point a lot to the district court's use of the term bounded when it talked about whether this market, he said that this market was not unbounded and referred to it being bounded. Now, bounded does not mean small, as CAE would suggest. Bounded simply means known or identifiable. That is the term's plain meaning, and that is clearly the meaning that the district court used here. And CAE hasn't pointed you to any cases that would support a different interpretation. That and because of Mr. Meisner's testimony that he had personal knowledge of and relationships with so many people in the industry, and because of the testimony that a lot of the customers MOVE was claiming was a secret were already in MOVE's database before Mr. Meisner joined, and because of the evidence that MOVE had developed contacts with so many of CAE's customers simply by attending industry conferences or by purchasing lists that are created by third parties like semi.org that list all of the players in the industry. Based on all of that evidence, the district court found, as a matter of fact, that it for as long as Mr. Meisner would have contact with a significant number of the major industry players, and there is simply no basis on which to find that that finding was clearly erroneous. I'd like to speak briefly about CAE's request in its papers that if the court, if this court were to overturn the district court's finding on likelihood of success, that it should just and render an injunction in this instance. It would be unusual for this court to weigh the remaining three factors, which are fact-based, in the first instance, but if it were inclined to do so, CAE has not carried its burden on any of those factors. First, as to irreparable harm, there are three reasons why CAE cannot demonstrate irreparable harm. First, the evidence is unequivocal that Mr. Meisner gave up access to the Google Drive account months before the preliminary injunction hearing. He has no access to those documents. MOVE has no access and never had access to those documents. The second reason is, frankly, CAE waited too long. As I mentioned earlier, we are four years past when Mr. Meisner stopped working for CAE. They did not file this request for an injunction until 18 months, nearly 18 months, after Mr. Meisner started working for MOVE and almost two and a half years after Mr. Meisner stopped working for CAE. In fact, they filed this lawsuit mere days before the statute of limitations ran. Third, CAE doesn't give any evidence that MOVE has interfered with any of CAE's customer relationships. In Merrick Brothers, which is a case out of the Northern District of Texas, the court denied a preliminary injunction even though there was evidence that the former employee had taken customer data with him and was doing business for one of those customers because the plaintiff failed to show any evidence that the defendant had outbid the plaintiff or was otherwise harming that relationship. So for all of those reasons, CAE hasn't carried its burden on the irreparable harm factor. As to balance of the equities, it is perfectly clear that to get equity, you must come to the court with clean hands, and quite simply, CAE does not. Mr. Gill, who is the vice president of CAE, offered sworn testimony about his purported conversation. What ultimate relief does the plaintiff seek in this case? Ultimately, the plaintiff asks that Mr. Meisner and MOVE be prohibited from competing with a list of approximately 200 customers, even though MOVE, I'm sorry, CAE offered no evidence that any of that information was secret, that the identity of those customers was secret, that Mr. Meisner knew about any of those customers, that Mr. Meisner ever tried to do business with any of those customers, or that MOVE has tried to do business with those customers. So it is seeking extraordinary relief, Your Honor. They're not just asking that the documents be returned. They're asking for an anti-competitive injunction pending trial. I see that I am out of time. Thank you, Your Honor. We request that the district court's order be affirmed. Thank you. Thank you, Your Honor. Let me address a few of the points my friend on the other side made. First, with respect to the customer lists, my friend says that we are only talking about the information that is in Mr. Meisner's head, because there are no customer lists. That is incorrect. The statute makes clear that you do not need to have a piece of paper that says it's a customer list in order to get trade secret protection. Mr. Meisner took thousands of our documents with the names of— What's the explanation for your client's delay in moving in this case? Your Honor, we moved expeditiously as soon as we found out that Mr. Meisner had taken these documents. It took a while for us to figure that out. He was under a one-year prohibition, and he absented himself entirely from the business for a year, as I understood it. And now you're talking about a year and a half past that. You're talking about two and a half years or so. Am I misreading the timetable? No, Your Honor, but when he was serving his non-compete, there was no reason for us to believe that he had any documents. He had promised us in contract that he had no such documents whatsoever. So why would we have— I thought that you realized what was going on because all of a sudden this competitor was getting a lot of business, and you didn't think there was any explanation for it unless they had some kind of proprietary data. No, Your Honor, that was later. So during the non-compete, Mr. Meisner, as far as we know, wasn't helping MOVE make any kind of business. It's only when he joined MOVE after serving the non-compete that MOVE suddenly, out of nowhere, rocketed to kinds of transactions they had never done before. And my friend says, oh, it's like language, their ability to have Chinese language. They had that before Mr. Meisner showed up. It's only when Mr. Meisner showed up with our secret information— What part of that new business was Chinese-based? That's not in the record, Your Honor. That's in exact percentages. The market is global, and it's hundreds of millions or billions of dollars. This is not a small market. This is a very large market. But let me get back to the customer list briefly. That's a pretty large market, too. Sorry, Your Honor? To charge after. It's a gigantic one. One of the department employees is going to keep you from that. That's a worldwide market. It's a worldwide market, and it's an extremely important market. As Your Honor knows, there are thousands of machines now that have semiconductors. The very openness of that market sort of puts into perspective the strike against a single employee's dramatic access, the effect of a single employee out there who has this information. Well, I don't think so, Your Honor. This is an employee who worked for us for 10 years. He had access to all of our secret information, and he put it on a secret personal— You fired him. You fired him. You sure did. And he had a year to lay out, and he stayed out of the year. And that would be fine had he not stolen the information, Your Honor. Why didn't you—you only had him under a one-year agreement. And that is perfectly appropriate— You could have negotiated a longer agreement. You didn't. If Mr. Meissner— What does a one-year agreement mean if he's not free to compete against you? Your Honor, the one-year agreement means if he takes no secret documents from us, he can go compete against us after a year, no problem. Well, the secret documents, the files, the computers, it's undisputed. There's records. I understand he didn't have them. That is— Those were purged, and he never had access to it. That's the record that comes to us. No, Your Honor. I disagree with that. Had that been true, the district judge on the customer list would have simply said, I don't—he didn't have those documents. That is not what the district judge said. He says these documents are not secret. They're not trade secrets at all. And that's because he finds that the market is so limited that Mr. Meissner knew all of this just in his work. And that's not true. This is tens of thousands of documents that we had Mr. Meissner took, and he—if you look at the record where he's talking with MOVE and explaining why he can use the documents with them, you'll see that there is no basis to believe that he didn't have the documents. Let me address one other thing my friend on the other side says. They say we've deleted the Google Drive now. We have no access to it. That is simply their own statement. There is no order from the district court telling them to do that, or that they're bound under pain of contempt to have done that. That's something they just say they did. We have not been able to test it. We have no forensic evidence as to what they've done with those files. Those files, for all we know, are sitting on Mr. Meissner's personal computer. And that makes them in a position to use the documents right now. Uh, one other point I want to make about these customer lists, because they are really crucial documents to us. The district court did not find that they don't have them. He did not base his opinion on that. He based his opinion solely on his understanding of the size of the market. With that, Your Honors, I urge you to reverse and remand with instructions to reconsider the PI. Thank you. Thank you, sir.